IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2011

**ALONZO FISHBACK v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. F-62885      Don R. Ash, Judge**

**No. M2010-00900-CCA-R3-PC - Filed June 29, 2011**

The petitioner, Alonzo Fishback, appeals the post-conviction court's denial of his petition for post-conviction relief from his convictions for especially aggravated kidnapping, aggravated assault, and possession of a weapon during the commission of an offense. He argues that he received the ineffective assistance of counsel at trial and on appeal. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

L. Gilbert Anglin, Murfreesboro, Tennessee, for the appellant, Alonzo Fishback.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Trevor Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was originally indicted on charges of especially aggravated kidnapping, attempted aggravated rape, and aggravated assault. The State nolle prosequied the attempted aggravated rape charge, and at some point another indictment was issued charging the petitioner with especially aggravated kidnapping, aggravated assault, and possession of a weapon during the commission of an offense. He was convicted of the three offenses as charged and sentenced to an effective term of seventy-five years in the Department of Correction. The petitioner appealed to this court, arguing that his convictions

for especially aggravated kidnapping and aggravated assault should have been merged. See State v. Alonzo Fishback a/k/a Loranzo Wilhoite, No. M2007-01971-CCA-R3-CD, 2008 WL 2521555, at *1 (Tenn. Crim. App. June 24, 2008), perm. to appeal denied (Tenn. Aug. 31, 2009). We affirmed the judgment below. Id. at *5.

The underlying facts of the case were recited by this court on direct appeal as follows:

On April 25, 2005, Patricia Forkum, the victim, was the manager of Hot Spot Tanning in Smyrna, Tennessee. That morning, [the petitioner] came into the store to inquire about tanning packages. When [the petitioner] entered the store, Ms. Forkum was cleaning one of the tanning rooms. Several people had just finished their tanning sessions. Ms. Forkum was responsible for cleaning the rooms and preparing them for the next round of clients. Ms. Forkum knew that someone had entered the store because she heard the doorbell that rang whenever someone entered or exited the store. There were one or two other clients in the store at that time.

M[s]. Fork[um] went to the front of the store when she heard the bell ring. She saw [the petitioner] at the front desk. M[s]. Fork[um] described [the petitioner] as approximately six feet five inches tall and weighing about 275 to 300 pounds. M[s]. Fork[um] is five feet eight inches tall and approximately 145 pounds. [The petitioner] inquired about several tanning packages. Ms. Fork[um] explained the various packages to [the petitioner] and gave him some information about their specials. The victim then helped another client by taking her to a tanning room. When the victim returned to the front of the store, [the petitioner] was still there. [The petitioner] asked the victim about the various tanning beds and "asked specifically if [they] had a stand-up bed." The victim told [the petitioner] that they had a stand-up bed that was located in the back of the store. [The petitioner] wanted to see it, so they walked to the back of the store where that bed was located in a "very small room." The victim entered the room first and explained to [the petitioner] "what the bed did and where everything was in the room." When she turned back around [the petitioner] "was in the room with [her]," blocking the door. [The petitioner] told her to "take off [her] clothes" and "get in there [the tanning bed]." The victim told [the petitioner] "no." [The petitioner] got closer to the victim. She "didn't want him to come any closer. So [she] put [her] hand on his chest." [The petitioner] grabbed her wrist and held onto it. [The petitioner] again told the victim to take off her clothes. She refused. The victim then noticed "something in [the petitioner's] hand that he was starting to come up toward me with." The item was "silver and kind of shiny looking, and it was pointed." The victim thought it was a knife, so she "grabbed [the petitioner's] wrist to push it down to keep him from stabbing [her]." [The petitioner] had scissors in his hand.

At that time, the doorbell rang and [the petitioner] was "startled." [The petitioner] stepped backward out of the small room and walked up toward the front of the store. The victim followed him to the front of the store. When [the petitioner] saw that there was not anyone at the front of the store, he turned back around "like he was going to come back down the hall" toward the victim. The victim started banging on the door of one of the tanning rooms that was occupied by a client. The client responded by saying that the room was occupied. Then, the victim turned and told [the petitioner] to "get out." [The petitioner] left through the front of the building.

The victim locked the door to the store and called the police. The victim estimated that the entire encounter in the small room lasted five to seven seconds. The victim did not have an exit from the small room because [the petitioner] was "blocking" the door to the tanning room. The tanning room had walls and a door, but the walls did not go all the way to the ceiling, for "ventilation" purposes.

As a result of the incident, [the petitioner] was indicted by the Rutherford County Grand Jury for especially aggravated kidnapping, aggravated assault, and possession of a weapon during the commission of a felony. A Rutherford County Jury convicted [the petitioner] of the charges as listed in the indictment after hearing the victim's testimony.

The trial court held a sentencing hearing at which the trial court determined that [the petitioner] was a career offender for the purposes of the especially aggravated kidnapping and aggravated assault convictions. The trial court sentenced [the petitioner] to sixty years for the especially aggravated kidnapping conviction and fifteen years for the aggravated assault conviction. The trial court ordered that these two sentences be served consecutively. In addition, the trial court ordered the sentence for especially aggravated kidnapping to run consecutively to "any offense [for which [the petitioner] was] on parole." The trial court sentenced [the petitioner] as a Range I, standard offender to two years for the conviction for possession of a weapon during the commission of a felony. This sentence was ordered to be served concurrently to the sentences for especially aggravated kidnapping and aggravated assault, for a total effective sentence of seventy-five years.

Id. at *1-2.

The petitioner filed a petition for post-conviction relief in which he requested a

delayed appeal, asserting that appellate counsel had failed to file an application for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure or "a Rule 14" and that he was denied the effective assistance of counsel. The post-conviction court began receiving testimony on the petition on April 24, 2009, but interrupted the proceedings and granted the petitioner's request for a delayed appeal. The Tennessee Supreme Court thereafter denied the petitioner's Rule 11 application. The petition for post-conviction relief was reinstated and later amended to raise other allegations of ineffective assistance of counsel.

At the April 24th hearing, trial counsel testified[1] that he and co-counsel represented the petitioner at trial, and then co-counsel was appointed to represent the petitioner on appeal. Asked how it was determined which issues to raise on appeal, trial counsel explained, "[F]rom the beginning the issue was whether or not the facts would support a charge of kidnapping. It was really a factual determination. And that was the thrust of the trial and that was the direction in which this appeal went." However, other than possibly discussing "some aspect of the appeal" with co-counsel, counsel was not involved in the appeal.

Asked whether he explained to the petitioner that the petitioner was "playing Russian roulette" with his defense and if he were convicted he would get sixty years, trial counsel said, "I didn't use the words Russian roulette and I didn't use the term 60 years." Trial counsel said that he discussed, orally, with the petitioner any offers made by the State. He recalled that the State "started out . . . somewhere around 30 years. 35[,]" and then "[t]he last offer that I remember that was made was 20 years and that would have been at 100 percent." Counsel said that he conveyed that offer to the petitioner and explained that the sentence after a trial "[c]ertainly . . . could be greater." However, the petitioner "did not want to agree to anything like 20 years at 100 percent" given his age. Counsel then contemplated that the offer may have been at sixty percent release eligibility. Counsel withdrew from representing the petitioner at the motion for new trial.

Co-counsel testified that he assisted in the representation of the petitioner at trial. Asked whether it was explained to the petitioner that he could be sentenced up to sixty years at 100% if convicted at trial, co-counsel stated, "I'm sure he was," but co-counsel did not recall being the one who explained that to the petitioner. Co-counsel was aware that "an offer [was] made" to the petitioner, but he did not "recall specifically an offer being made that would have been anything that he would have accepted." Co-counsel did not recall personally discussing any offers with the petitioner, and he did not memorialize anything in writing that he had such discussions with the petitioner.

---

[1] We confine the majority of our recitation of the testimony to that relevant to this appeal.

Co-counsel testified that he was appointed to handle the petitioner's appeal. He did not believe he discussed with the petitioner which issues to raise before he filed the brief. He said that generally whatever issues were raised in the motion for new trial "would carry over." Co-counsel believed the petitioner was eventually sent a copy of the brief, but he acknowledged that it may have been several months later. Due to an oversight, the petitioner was not informed of the result of the appeal within the time limit for filing for permission to appeal with the supreme court. Thereafter, the post-conviction court stopped the proceedings and granted the delayed appeal.

After the resolution of the delayed appeal, the post-conviction court resumed proceedings on March 16, 2010, at which the petitioner testified that he retained counsel and co-counsel to represent him at trial. The petitioner met with counsel in May 2005 after being arrested on April 29, 2005. Counsel met with the petitioner for twenty minutes that day and communicated that he would return to meet with him again. However, the next time the petitioner saw counsel was at a preliminary hearing sometime in May 2005, and he did not see counsel thereafter until he was in circuit court for a plea discussion.

The petitioner stated that counsel related to him that the State had offered a plea of forty years at 100% and dismissal of the second and third counts of the indictment. Counsel told the petitioner that the offer was "ridiculous" and rejected it. At another court date, the State dismissed count two of the original indictment, but counsel did not explain to the petitioner the rationale for or the ramifications of the State dismissing that charge. The petitioner later found out that the State dismissed the attempted aggravated rape charge because "it would have been double jeopardy . . . if they had pursued attempted rape along with kidnapping."

The petitioner said that after the State brought the second indictment against him, he was presented an offer of twenty-five years at 100% and dismissal of the other counts of the indictment. Counsel advised him that it was not a good offer, so he rejected it and proceeded to trial. The petitioner "thought that there wasn't no way that [he] could get convicted of especially aggravated kidnapping with the circumstances that took place in the case," and he rejected the offers on the advice of counsel.

The petitioner testified that counsel discussed the elements of the offenses with him, but counsel "didn't explain to [him] fully all the elements that [he] had to be convicted of to get a conviction for [the charge of especially aggravated kidnapping]." He said that counsel met with him the night before trial and informed him that the State was going to try to convict him on the especially aggravated kidnapping charge even though counsel thought there was no kidnapping. According to the petitioner, counsel never explained to him "[t]he potential" that he would be convicted on the charge or the punishment he would face if

convicted.

The petitioner testified that counsel told him that he knew the petitioner had "an extensive record," but he did not explain that the petitioner would likely receive the maximum sentence of sixty years. He said that counsel showed him a paper indicating that the State had elected to enhance his punishment, but the paper related to the first indictment and the State never filed a notice of enhancement related to the second indictment. Counsel never explained the law with regard to utilizing the notice from the first case in the second case.

The petitioner stated that he would have probably "tr[ied] to get the lowest offer from the State" had he been informed of the elements of the crime, the true potential for conviction, and true potential for sentencing. The petitioner said that counsel never discussed the merger doctrine with him. The petitioner recalled that counsel argued at the motion for new trial that the kidnapping and assault convictions should have merged, and his direct appeal dealt with that one issue. However, he was never sent a copy of the briefs or filings from the appeal and only discovered the appellate opinion while researching in the prison library. The opinion had been filed three months earlier. He called counsel but did not get an answer. He eventually received a copy of his appellate brief "three to four months after it was filed."

The petitioner testified that the sufficiency of the evidence of his especially aggravated kidnapping charge was not challenged on appeal, and he would have wanted that issue raised had he known that a notice of appeal had been filed and that counsel was going forward with a direct appeal. Issues related to sentencing were also not raised on appeal, nor was the counter-argument that the aggravated assault should have merged with the especially aggravated kidnapping raised.

On cross-examination, the petitioner admitted an extensive criminal history, including three robbery convictions resulting from guilty pleas. He acknowledged that the court had explained to him sentencing ranges such as range one, range two, range three, and career offender, at those plea colloquies. He admitted that he had been incarcerated for fourteen or fifteen years of his life. The petitioner stated that he spoke to counsel one time over the telephone during preparation for the case.

The petitioner clarified that counsel discussed the elements of especially aggravated kidnapping with him after the petitioner obtained the elements from someone at the jail, and counsel told him that the State had to prove every element of the offense. He acknowledged that, at that time, he had already received a copy of the indictment and that he had already

-6-

obtained a copy of the statute from someone at the jail. The petitioner admitted that he and counsel discussed that any sentence over twenty years would essentially be a life sentence because of the petitioner's age. However, the petitioner said that he would not agree to a sentence of twenty years or more "[b]ecause [counsel] told [him] there was no kidnapping in this charge." When he rejected the State's offers, the petitioner did not believe he was guilty of especially aggravated kidnapping because he did not know the elements of the offense.

On redirect examination, the petitioner stated that counsel never told him that he could possibly receive a sentence of fifteen years if convicted of aggravated assault. The petitioner said that he "would have thought about" taking an offer of twenty-five years had he known the elements of especially aggravated kidnapping.

Trial counsel testified that he had been an attorney since 1973 and had worked as a prosecutor for about ten years before entering private practice in 2003. Counsel recalled that the petitioner had experience with criminal proceedings and that "there wasn't really any factual dispute" in this case. Most of the events "were clearly evidenced without any dispute by a . . . surveillance video in the business." The video showed the petitioner reaching over the counter, grabbing a pair of scissors, and putting the scissors in his back pocket. The victim relayed at the preliminary hearing that the petitioner entered the tanning salon and inquired about a tanning package. The victim showed the petitioner around the salon and ultimately ended at a stand-up tanning booth in the back, located in a "fairly small" room. When the victim tried to leave the room, the petitioner blocked the door and told her to "'[t]ake [her] clothes off.'" The petitioner reached in his back pocket and produced a shiny object. Counsel recalled that he did not see any way to attack the petitioner's credibility; the sole question was whether there was a confinement.

Counsel testified that the recording from the first preliminary hearing was misplaced, so a second preliminary hearing was ordered. Counsel's questions and the victim's testimony "were basically the same," including the victim's testimony that the petitioner blocked the door of the tanning room for six to eight seconds.

Counsel testified that he met with the petitioner prior to the first preliminary hearing and told him that they would talk again after the hearing. He spoke with the petitioner at three court dates as well as four or five times at the jail, including the visit prior to the first preliminary hearing. Counsel also received six to ten phone calls from the petitioner from jail, which he accepted, even though some of the calls were after the trial. He said that he spoke with the petitioner in person at the jail on two occasions as they "approached ultimately the second trial."

Counsel recalled that the State originally offered the petitioner a sentence of forty years at 100%, but that was basically a life sentence due to the petitioner's age so they rejected the offer. The petitioner was given a second offer of thirty years at 100%, but it would have also been in essence a life sentence because it would have been consecutive to the sentence the petitioner had been paroled on. The State eventually offered the petitioner twenty-five years, but the petitioner's position was, again, that it was basically a life sentence. Counsel and the petitioner discussed that an offer in the ten- to fifteen-year range would be considered. Counsel thought that the State might accept a counteroffer of twenty years, but the petitioner never authorized counsel to make that offer because he would have been close to seventy years old when released.

Counsel testified that the petitioner was aware that a conviction for kidnapping could be maintained under the law, but they hoped that the jury would not "think those facts conformed to what people normally would associate with kidnapping." Counsel said that he was familiar with the elements of especially aggravated kidnapping and had dealt with that offense before. Counsel had a copy of the indictment, which he reviewed with the petitioner, along with a copy of "the Criminal Law Handbook" where the offenses were defined. He recalled that the handbook also had a sentencing grid, and they went through the petitioner's offenses "with regard to that grid." Counsel found the petitioner to be "very knowledgeable" because of his experience with "the system." At one point, the petitioner talked to counsel about the Anthony case, which had not been decided at that point, and its potential impact on the petitioner's case. Counsel denied telling the petitioner that the State would have to prove serious bodily injury to prove especially aggravated kidnapping because, although a classic element of the offense, it was not applicable in the petitioner's case.

On cross-examination, counsel testified that he spent thirty minutes to an hour with the petitioner during their first meeting, discussing "the procedure that was facing him." Counsel also saw the petitioner once or twice shortly before trial. He elaborated that he had conversations with the petitioner at the various court dates, which included at least six court appearances and two preliminary hearings, and that he met with the petitioner four or five times pretrial at the jail. Counsel could not recall what he informed the petitioner regarding the ramifications of the State's dismissing the attempted rape charge in the original indictment.

Counsel denied ever telling the petitioner that the facts would not support the especially aggravated kidnapping conviction. Counsel said that both he and the petitioner understood that there was the potential for the petitioner to be convicted of the kidnapping charge as long as the charge went before the jury. Counsel said that the petitioner knew that

he would essentially get a life sentence if he was convicted of especially aggravated kidnapping, and counsel had gone over the sentencing grid with the petitioner explaining that he could receive a sentence of sixty years.

Counsel admitted that part of their trial strategy was that they were not going to contest that an aggravated assault took place. Asked whether he explained to the petitioner that by essentially admitting the aggravated assault he was exposing himself to a sentence of fifteen years, counsel responded that he explained the full range of punishment on all of the offenses to the petitioner. Counsel further elaborated that he and the petitioner "had always talked about the fact if [they] ended up somewhere in the 10 to 15 year range that that was a victory." Counsel said that they talked about the fact that the petitioner was a career offender, and counsel "explained to him what the penalties were on the various charges as a career offender." Counsel could not remember what he told the petitioner specifically regarding consecutive or concurrent sentencing, but he "fe[lt] like" they discussed it.

Counsel said that he did not prepare a trial notebook or keep time records in the case that would have memorialized his preparations with the petitioner. Counsel stated that co-counsel handled both the motion for new trial and the appeal, but co-counsel discussed with him the issues he was going to raise on appeal. Counsel recalled that two of the issues were whether the "minimal detention" of the victim was sufficient to support the especially aggravated kidnapping conviction and whether some of the offenses should have merged. Counsel stated that the petitioner called and wrote to him wanting a copy of the appellate brief that was filed, as well as complained to the Board of Professional Responsibility regarding the handling of the appeal. Counsel informed the petitioner through the Board that co-counsel was handling the appeal, but nonetheless obtained a copy of the brief for the petitioner.

Counsel testified that, in preparing for a case, his normal practice was to research the offense by "go[ing] to the code book and read[ing] the annotations on what it says on the various elements of the offense." With regard to appeals, counsel stated that his normal practice would be to forward the brief to the client after it was filed. He said that he normally would have discussed with his client which issues to raise on appeal during the time after trial and prior to the motion for new trial. However, counsel was not the one who had these discussions with the petitioner, and he was "not sure what was discussed."

Counsel testified that he did not recall to what degree, if any, he discussed the facts of the petitioner's case with members of the petitioner's family. Counsel did not think he had any reason to have extended discussions regarding the likelihood of the petitioner's being convicted on the kidnapping charge to the petitioner's mother.

Barbara Fishback, the petitioner's mother, testified as a rebuttal witness that during the course of counsel's representation of the petitioner, she met with counsel three times at his office. She said that counsel told her that the facts did not indicate that an especially aggravated kidnapping occurred because the time frame of the detention was only six to seven seconds. Counsel told her, "[I]f we could get rid of that charge we would be doing good."

After the hearing, the post-conviction court entered a written order denying the petition. The court found that the proof presented by the petitioner concerning his allegations did not rise to the level of ineffective assistance of counsel and that the petitioner failed to present evidence concerning his allegation that counsel "failed to object regarding the indictment."

## ANALYSIS

The petitioner argues that the post-conviction court erred in denying his petition because he received the ineffective assistance of counsel at both trial and on appeal. Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id.; see Dellinger v. State, 279 S.W.3d 282, 292 (Tenn. 2009). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal

cases also applies in Tennessee). The <u>Strickland</u> standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996) (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, <u>see</u> <u>Strickland</u>, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. <u>See</u> <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

The petitioner raises numerous allegations of ineffective assistance of counsel. He asserts that trial counsel was ineffective for failing to inform him of each offer made by the State, failing to communicate regarding the progress of the case, not informing the petitioner of the elements of the crime, misinforming the petitioner regarding the State's burden of proof, informing him that the State could not prove the offense of especially aggravated kidnapping, failing to object to the indictment, and not explaining the ramifications of the State's dismissal of the attempted aggravated rape charge or object thereto. The petitioner asserts that appellate counsel was ineffective for not challenging the sufficiency of the evidence regarding the especially aggravated kidnapping conviction or raising as an issue that the aggravated assault conviction should have merged into the especially aggravated kidnapping conviction.

With regard to the petitioner's assertion that trial counsel failed to inform him of each offer made by the State, the petitioner relies on counsel's testimony from the April 24, 2009

hearing that the last offer was twenty years, which contradicted the petitioner's recollection that the last offer was twenty-five years. At the March 19, 2010 hearing, counsel testified that the petitioner received offers of forty, thirty-five or thirty, and twenty-five years. The discrepancies in counsel's testimony could be attributed to his trying to recall events that happened several years earlier, and the post-conviction court resolved the conflicts in testimony as was its province. By its findings, the post-conviction court implicitly accredited counsel's testimony that he discussed all offers with the petitioner. Therefore, the petitioner failed to prove that counsel performed deficiently with regard to the discussion of plea offers.

With regard to the petitioner's allegations that counsel failed to communicate regarding the progress of the case, discuss the true elements of each crime, the true potential for conviction, and the true potential for sentencing, counsel testified that he discussed the elements of the offenses with the petitioner and went over the sentencing grid, explaining the sentences he could receive on the charges including that he could receive a sentence of sixty years on the kidnapping charge. Counsel denied ever telling the petitioner that the facts would not support the especially aggravated kidnapping charge and testified that both he and the petitioner understood that there was the potential for the petitioner to be convicted of the kidnapping charge as long as the charge went before the jury. Counsel also relayed the various times he met with or had discussions with the petitioner, including meetings at three court dates, four or five times at the jail, and six to ten phone calls. The post-conviction court implicitly accredited counsel's testimony; thus, the petitioner has failed to prove any deficiency in counsel's performance. Moreover, the petitioner has arguably failed to prove prejudice because he never testified that he would have taken the twenty-five-year offer from the State; he testified that he "would have thought about" it.

With regard to the petitioner's allegation that counsel was ineffective for failing to move to dismiss the second indictment, the petitioner has failed to show how he was prejudiced by such failure. The petitioner was originally indicted on charges of especially aggravated kidnapping, attempted aggravated rape, and aggravated assault. The attempted aggravated rape charge was dismissed, and less than a week later, the court remanded the case to general sessions court for another preliminary hearing because the tape from the first hearing had been lost. The record is unclear as to what occurred in the interim, but a new indictment was brought against the petitioner about three months later, charging him with especially aggravated kidnapping, aggravated assault, and possession of a weapon during the commission of an offense. The petitioner was ultimately convicted on the second indictment. The petitioner asserts that the original charges remained as pending and "[o]bviously, [he] cannot be charged with the same offenses twice." However, the petitioner presented no evidence as to how he was actually prejudiced by counsel's failure to seek dismissal of the indictment and has therefore failed to prove this issue by clear and

convincing evidence.

With regard to the petitioner's contention that counsel was ineffective for not explaining the ramifications of the State's dismissal of the attempted aggravated rape charge or object thereto, we cannot conclude that counsel was ineffective. The petitioner asserts that counsel's failure to apprise him of the ramifications "gives even more credence to [his] contention that trial counsel never fully informed him of the elements of the offenses for which he was charged, the potential for conviction, the potential range of punishment or all of the offers made by the State." However, as addressed above, the petitioner failed to prove that counsel performed deficiently regarding those contentions, and we do not see how any failure to apprise him of the ramifications of the dismissal caused him prejudice.

The petitioner asserts that appellate counsel was ineffective for not challenging the sufficiency of the evidence regarding the especially aggravated kidnapping conviction. He asserts that the kidnapping was not accomplished with a deadly weapon but instead "by the subterfuge of [the petitioner] seeking to see a stand-up tanning bed." He urges that his actions were more properly aggravated kidnapping, and that counsel should have challenged the sufficiency of the especially aggravated kidnapping conviction on appeal. The petitioner, however, has failed to prove his allegations by clear and convincing evidence. Appellate counsel, although called to testify at the hearing regarding the delayed appeal, was never called to testify about his reasoning concerning his failure to challenge the sufficiency of the evidence. Given the minimal evidence regarding appellate counsel's performance, we cannot conclude that the petitioner met his burden of proving that counsel performed deficiently.

In addition, our review of the trial transcript indicates that the petitioner has likewise failed to prove that he was prejudiced by the failure to raise the sufficiency issue on appeal. The victim testified at trial that she was unable to leave the room because the petitioner was blocking her and that the petitioner's display of the scissors played a role in her ability to leave the room. Even if the petitioner's initially getting the victim into the tanning room was by subterfuge, the victim's testimony suggests that his actually detaining her in the room involved the "weapon." Thus, there was evidence presented to the jury by which a rational trier of fact could have concluded that the "false imprisonment [of the victim was] [a]ccomplished . . . by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" <u>See</u> Tenn. Code Ann. § 39-13-305(a)(1). Therefore, the petitioner has failed to prove that any deficiency in appellate counsel's performance caused him prejudice.

The petitioner also argues that appellate counsel was ineffective for failing to raise as an issue on appeal that the aggravated assault conviction should have merged into the

especially aggravated kidnapping conviction. However, the petitioner did not raise this issue in his petition or amended petitions.[2] In any event, as with the petitioner's allegations concerning the failure to challenge the sufficiency of the evidence, the record is very sparse concerning appellate counsel's performance and does not rise to the level of clear and convincing proof.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE

---

[2] The only "merger" issue raised in the petitions was that the possession of a weapon during the commission of an offense conviction should have merged into the especially aggravated kidnapping and/or aggravated assault convictions.